**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

|  |  |  |
|---|---|---|
| | x | |
| JAMES R. DALTON, et. al, | x | |
| | x | Hon. Stanley R. Chesler, U.S.D.J. |
| Plaintiffs, | x | |
| | x | Civ. No. 05-727 (SRC) |
| v. | x | |
| | x | **OPINION** |
| | x | |
| GENERAL MOTORS CORP., et. al, | x | |
| | x | |
| Defendants. | x | |

_____


**CHESLER, District Judge**

     This matter comes before the Court upon Attorney Richard Burton's and Plaintiffs' Appeal of Magistrate Judge Bongiovanni's June 24, 2005 Order which denied Mr. Burton's *pro hac vice* admission to this Court. (Docket entry # 23.)  This Court, having considered the papers submitted by the parties, for the reasons set forth below, and for good cause shown, denies the appeal and affirms the Magistrate Judge's Order.


**I. BACKGROUND**

     This case was initiated on or about February 2, 2005.  On or about March 28, 2005, Defendants filed an answer, as well as various motions, including one for summary judgment and one to dismiss several counts of the Complaint.  Those motions are still pending.  On or about

April 22, 2005, counsel for Plaintiffs made a motion for the admission *pro hac vice* of seven attorneys.  Plaintiffs' moving papers in support of this motion conveyed that Defendants consented to the admission of all but one of the applications, that of Mr. Richard J. Burton.   The instant appeal pertains only to Mr. Burton's application.[1]

As required under Local Rule 101.1(c), Plaintiffs' application and Mr. Burton's supporting affidavit made representations that Mr. Burton was not under suspension or disbarment by any Court and that he was in good standing with the Bars of Florida and the District of Columbia.  Defendants, however, filed opposition to his *pro hac vice* application asserting that Mr. Burton's "lengthy history of unethical, uncivil and unprofessional behavior toward witnesses, opposing counsel and the courts" should compel the Court to deny his *pro hac vice* admission.

Defendants submitted their opposition papers on or about May 2, 2005, at which time Plaintiffs requested an extended briefing schedule so as to be able to adequately respond to Defendants' lengthy submission which included approximately 334 pages of accompanying exhibits.  With Defendants' consent, the Court adjourned the return date from May 16, 2005, to June 20, 2005.  Plaintiffs were given an additional five weeks to respond to Defendants' opposition.

On or about June 8, 2005, Plaintiffs filed their reply brief, including approximately 260 pages of accompanying exhibits.  On or about June 24, 2005, the Magistrate Judge issued an

---

[1]Although Plaintiffs submitted the original *pro hac vice* motion as well as the instant appeal, the Court may refer to Mr. Burton or Plaintiffs interchangeably when referencing submissions made in support of these motions.  The reference is only intended as a way to simplify the Court's opinion due to the unusual posture of this motion, which does not directly involve a party.

order denying Mr. Burton's application to appear *pro hac vice* in this Court.  The June 24, 2005

Order stated that Mr. Burton's "collective ethical history suggests the Court should exercise its

discretion and deny his admission to this Court."  Plaintiffs now appeal the Magistrate Judge's

decision, pursuant to Local Rule 72.1(c)(1), asserting that the decision to deny Mr. Burton's *pro

hac vice* admission was clearly erroneous and contrary to law.


## II. LEGAL STANDARDS

### A. Standard of Review

The standard of review of a magistrate judge's decision depends upon whether the issue

addressed was dispositive or non-dispositive.  Andrews v. Goodyear Tire & Rubber Co., 191

F.R.D. 59, 67 (D.N.J. 2000).  A district court may reverse a magistrate judge's order on a non-

dispositive matter only if it finds the ruling clearly erroneous or contrary to law.  Id.; see also 28

U.S.C. § 636(b)(1)(A); Fed. R. Civ. P. 72(a); L. Civ. R. 72.1(c)(1)(A).  The district court is

bound by the clearly erroneous rule as to findings of fact, while the phrase "contrary to law"

indicates plenary review as to matters of law.  See Haines v. Liggett Group, Inc., 975 F.2d 81, 91

(3d Cir. 1992).  According to the Supreme Court, "a finding is 'clearly erroneous' when although

there is evidence to support it, the reviewing court on the entire evidence is left with the definite

and firm conviction that a mistake has been committed."  United States v. U.S. Gypsum Co., 333

U.S. 364, 395 (1948).  "Where a magistrate judge is authorized to use his or her discretion, the

decision will only be reversed for an abuse of that discretion."  Cooper Hosp. v. Sullivan, 183

F.R.D. 119, 127 (D.N.J. 1998).

Pretrial matters, such as discovery and attorney disqualification, are treated as non-

dispositive matters in this Court.  Andrews, 191 F.R.D. at 68.  Therefore, the denial of Mr.

Burton's *pro hac vice* application will be considered under the non-dispositive standard and only

reversed if this Court determines the magistrate judge's ruling was "clearly erroneous or contrary

to law."

### B. Standard for Admission *Pro Hac Vice*

The United States District Courts have no uniform standard for admission *pro hac vice*.

In re Dreier, 258 F.2d 68, 69 (3d Cir. 1958) ("there is no federal procedure for examining

applicants either as to legal ability or moral character.")  In the District of New Jersey, guidance

comes from local rule 101.1(c)(1), which states in pertinent part: "Any member in good standing

of the bar of any court of the United States or of the highest court of any state, who is not under

suspension or disbarment . . . may in the discretion of the Court, on motion, be permitted to

appear and participate in a particular case." N.J. Fed. Prac. R. 101.1(c)(1) (emphasis added).

Although there are few stated requirements under this rule, the discretionary language, including

the specific choice of the word "may," undoubtedly contemplates situations where good standing

alone may not be enough to secure *pro hac vice* admission.  Kohlmayer v. Nat'l R.R Passenger

Corp., 124 F. Supp. 2d 877, 889 (D.N.J. 2000).  Indeed, unacceptable attorney conduct or

character might not always be gleaned solely from an attorney's bar standing alone.  If that were

the case, the local rules would have provided that any licensed attorney would be granted

admission simply upon application.

Motions for *pro hac vice* admission are liberally granted in this Court, but this practice

should not suggest that the Court lacks standards for *pro hac vice* admission outside of the

requirements articulated in the Court's local rules.  Although it is true that most *pro hac vice*

motions are granted, they are more often than not unopposed or submitted with the consent of opposing counsel.  However, where there appears to be question regarding the fitness of a lawyer seeking *pro hac vice* admission, this Court relies upon, and indeed expects, the assistance of the attorneys in the matter to present such information to the Court.  It would be impossible for the Court to undertake an independent background review of every attorney seeking *pro hac vice* admission.

The judiciary of the District of New Jersey seeks to maintain the highest standards of professional responsibility among the attorneys and litigants appearing in its courtrooms.  By designating the Court as the gatekeeper of out-of-town counsel, the authors of the local rules anticipated that the Court would utilize its discretionary review of *pro hac vice* applications to maintain these standards and that the Court would occasionally deny applications for good cause shown.  It is of the utmost importance to this Court that admitted attorneys exemplify good moral and professional character at all times.

There is little case law available in the District of New Jersey to define the standards of granting or denying *pro hac vice* admission.  The issues and concerns of the Court relating to *pro hac vice* admission are thoughtfully discussed in <u>Kohlmayer v. National Railroad Passenger Corp.</u>, 124 F. Supp. 2d 877 (D.N.J. 2000).  In that case, the court affirmed a magistrate judge's decision to deny a *pro hac vice* application, emphasizing the importance of attorney civility in and out of the courtroom.  <u>Id.</u> at 879.  The court noted that although uncivilized attorney conduct may not rise to the level of a technical violation of ethics rules resulting in official discipline, that conduct may nonetheless be a cause of concern because of its "stain on the legal profession and often [its] delay[] [of] the judicial process."  <u>Id.</u>

In Kohlmayer, the attorney seeking *pro hac vice* admission had a record "replete with instances of grossly inappropriate, uncivilized, and unprofessional behavior." Id. at 880. Specifically, a mistrial was granted in a federal court matter, in part due to the attorney's "improper opening statement, his egregious leading of witnesses, his attempt to coach the plaintiff during cross- examination . . . and his troubling demeanor." Id. at 881.  The Kohlmayer court cited another case involving the same attorney where a district court granted a motion for a new trial by defendants based upon the attorney's "grossly uncivilized behavior at trial." Id. at 880.  The attorney verbally attacked his adversary during trial and on the record.  Id.  He apologized for the outbursts and the court continued the trial with a "'wait-and-see' attitude."  Id. When granting defendants' motion for a new trial, the court noted that it made a mistake when it allowed the trial to proceed, as the attorney's poor conduct only continued through trial.  Id.

The attorney in Kohlmayer unsuccessfully argued that the above noted incidents and other cited conduct were not relevant to his pending *pro hac vice* application.  In rejecting this assertion, the court noted that "[i]f [the attorney] chooses to act in an uncivilized, possibly unethical manner, he should expect negative repercussions."  Id. at 881.  The attorney argued that the court did not have the authority to deny *pro hac vice* admission where an attorney is in good standing.[2]  He further asserted that "admission to a state bar creates a presumption of good moral character that cannot be overcome by the 'whims of the district court.'" Id. at 882 (citing Schlumberger Tech., Inc. v. Wiley, 113 F.3d 1553, 1559 (11th Cir. 1997)).  Although the court did not disagree with this premise, it added that "the record [before the Court] is more than

---

[2]At the time of his application for *pro hac vice* status, the attorney was not under any suspension or disbarment, although the Court was aware of pending disciplinary proceedings.  Id. at 882.

6

sufficient to overcome (in a far from whimsical manner) the presumption of [the attorney]'s good moral character." Id.

The Third Circuit Court of Appeals mandated certain procedures for the administration of *pro hac vice* revocations in Johnson v. Trueblood, 629 F.2d 302 (3d Cir. 1980).  Although Johnson involved the revocation of an attorney's *pro hac vice* admission at the conclusion of trial rather than an initial *pro hac vice* application, the Court will assume *arguendo* that the Third Circuit's decision applies to the denial of a *pro hac vice* admission, as well as its revocation.

In Johnson, the United States District Court for the Eastern District of Pennsylvania revoked the *pro hac vice* admission of an attorney based upon his conduct during trial.  Id. at 302.  The attorney had no notice or hearing on the matter, which was initiated *sua sponte* by the court.  Id.  The issue presented to the Third Circuit on appeal was "what procedures should be used where a district court seeks to revoke an attorney's pro hac vice status."  Id. at 303.

The Third Circuit held that when a district court seeks to revoke an attorney's *pro hac vice* status, "some type of notice and an opportunity to respond" are required.  Id.  The actual type of notice required is at the discretion of the court, but at a minimum, the notice should include a description of the conduct in question and the specific reason that conduct may justify revocation.  Id. at 304.  The second requirement, an "opportunity to respond," does not necessarily mandate a full scale hearing, but does necessitate a "meaningful opportunity to respond to the identified charges."  Id.  "[I]n certain cases a full hearing might be desirable," but this decision is also at the district court's discretion.  Id.

This Court is convinced that an attorney's good moral and professional conduct is an appropriate and essential inquiry when considering a motion for *pro hac vice* admission, and that

indeed, a consistent record of improper conduct may warrant denial of the application.  Although past disciplinary actions are by no means a bar to admission to this Court, they are entirely relevant to the Court's review of the attorney's background and fitness to practice in this district. Further, this Court is satisfied that there is a point where an attorney's "repeated, documented, instances of uncivilized behavior, whether or not rising to the level of disbarable offense, strips him of the privilege of *pro hac vice* admission." <u>Kohlmayer</u> 124 F. Supp. 2d at 883.  The determination of whether an attorney's conduct merits denial of *pro hac vice* admission must be made on a case-by-case basis and the ultimate determination of the attorney's admission *pro hac vice* is at the discretion of the Court.

Although this Court will consider the procedural requirements articulated by the Third Circuit in <u>Johnson</u>, this Court does not intend to suggest that the mandate applies to initial application denials in this district.   Indeed, it appears to this Court that any concerns as to notice and opportunity to respond are essentially fulfilled by motion practice, which is the procedure for *pro hac vice* admission in this Court.

## III. DISCUSSION

Mr. Burton's application for *pro hac vice* admission to this Court provided the required representation that he is a member in good standing of the Bar of the State of Florida and of the District of Columbia.  The application, however, made no reference to Mr. Burton's past disciplinary record or the pending allegations against him.  While Plaintiffs are correct that local rule 101.1(c)(1) does not explicitly require this disclosure, the Court's discretionary review of a *pro hac vice* application might, and in this case certainly does, warrant consideration of such past

conduct.  Plaintiffs' appeal papers state that Magistrate Judge Bongiovanni's June 24, 2005 Order makes it "impossible to determine whether [she] accepted any of the numerous disputed points made in the Defendants' memorandum."  (Pls.' Appeal at 5, docket entry 23.)  Plaintiffs criticize the Order for its failure to provide a "written reason for denial other than a vague reference to Mr. Burton's 'collective ethical history.'" (<u>Id.</u> at 8.)   Plaintiffs reference no statute, federal rule, local rule, or case law, which requires a lengthy explanation for a *pro hac vice* denial, and this Court is not aware of any.  After a close review of the papers submitted by the parties in support of this appeal, this Court not only agrees with the Order, but believes Magistrate Judge Bongiovanni extended a courtesy to Mr. Burton when she refrained from detailing his past conduct in a more extensive decision.

### A. Factual Findings - "Clearly Erroneous" Standard

The district court reviews a magistrate judge's findings of fact for clear error.  <u>Mruz v. Caring, Inc.</u>, 166 F. Supp 2d 61, 66 (D.N.J. 2001) (citing <u>Cooper Hosp.</u>, 183 F.R.D. at 127).  The Court will review Mr. Burton's disciplinary proceedings and actions, and instances of alleged improper conduct during the course of litigation in other jurisdictions.  With respect to Mr. Burton's discipline, there appears to be little dispute between the parties about the facts giving rise to those actions.  Mr. Burton, however, submits for the Court's consideration, explanatory responses for the conduct.  The alleged improper conduct in other litigation matters, much of which appear in court transcripts, are disputed to the extent that Plaintiffs assert Defendants "misconstrued" the facts with regards to the evidence presented.

### i. Disciplinary Proceedings and Actions

Mr. Burton's disciplinary history is less than exemplary.  Over the course of his thirty-one year career, the Florida Supreme Court has admonished him once, reprimanded him once, and suspended him twice.  (Letter from Fla. Bar to Ralph DeSena of 2/27/2003.)  Even more troubling to this Court is the fact that Mr. Burton's first reported incidence of misconduct arose in 1988, approximately fourteen years after his admission to the Florida Bar.  Mr. Burton's second suspension was seven years ago, in 1998, following lesser sanctions in 1992 and 1994. The incidents described below, although inexcusable under any circumstances, were undertaken by an experienced and seasoned trial attorney, and they were not limited to one or two isolated occurrences.

### a. 1990 Suspension

In 1990, Mr. Burton came before the Florida Supreme Court on a consolidation of two complaints of attorney misconduct.  Although Mr. Burton did not admit that his conduct constituted a violation of the disciplinary rules as charged, he did admit to the factual allegations. The Referee hearing the case recommended Mr. Burton's suspension for 90 days and probation for two years.  In addition, during the probationary term, he recommended that Mr. Burton obtain counseling and file a quarterly report with the Florida Bar.

The first part of the 1990 bar complaint involved Mr. Burton's deliberate communication with his client's adversaries (three defendants) when he knew these individuals were represented by counsel.  Late on the evening of June 26, 1988, following a jury verdict in his client's favor, Mr. Burton called each of the three elderly defendants sometime after 11:00 p.m. to inform them of his client's victory.  To one defendant he said, "You lost it all, you dirty bastard."  To another

he stated that his client got a lot of money and also called him a "dirty bastard." To the third

defendant, Mr. Burton stated that he "beat the hell out of him."  (Amend. Report of Referee of

8/6/1990.)

> The referee's report and recommendation on this complaint reads as follows:

> The prohibition on contact with opposing parties represented by counsel is elementary; for an experienced trial attorney, such as [Mr. Burton], it is axiomatic. Violation of the proscription for the sole purpose of annoyance and humiliation, in satisfaction of a petty vendetta, is most serious.  The targets of the instant contacts were all elderly individuals, each of whom was called at home, late at night, and subjected to juvenile profanity.  Each contact constituted outrageous and intolerable behavior by a member of the Bar.

(Id.)   In his supporting papers to this Court, Mr. Burton attempts to justify this conduct as the

result of "'roid rage."   (Pls.' Reply, Burton Aff. ¶13.)  Mr. Burton explains that at time of the

trial, he was "taking large doses of medically prescribed hydrocortisone (steroid)." (Id.)  Mr.

Burton reports that a deposition of his doctor later revealed "that side effects of such high doses

of hydrocortisone are 'roid rage,' which can be intensified by alcohol."  (Id.)  Further, Mr. Burton

states that he does not recall making the phone calls to the defendants following the verdict.

(Id.).  Mr. Burton contends that he experienced an unusually trying day after he was allegedly

"punched ... in the face" by opposing counsel, which caused him to be "very upset and

distraught."  (Id.)

The second part of the 1990 bar complaint alleged "conduct involving dishonesty, fraud,

deceit or misrepresentation which adversely reflects on his fitness to practice law."  (Amend.

Report of Referee of 8/6/1990.)  Specifically, the findings of fact in the referee's report explain

that a female client retained Mr. Burton to represent her in a divorce proceeding in or around July

1986.  During the course of representation, Mr. Burton "became aware of physical,

psychological, emotional and medical problems which were suffered by [his client]." (Id.) Mr.

Burton received $2,500 in temporary attorney's fees from his client's husband on or about

August 6, 1986, and in December 1986 he received three checks for the agreed divorce

settlement payable to his client. The client requested her settlement checks, but Mr. Burton,

contrary to a previous agreement, refused to release the checks until she paid all incurred costs

and fees. In addition to "poor judgment in his handling and explanation of the fee and cost

matters" to his client, Mr. Burton engaged in "miscellaneous sexual contact" with her during the

course of his representation. (Id.)

> The Florida Supreme Court Referee's report stated the following:

> The attorney-client privilege is founded upon trust, fostering, in turn, an intellectual, and often emotional, dependency. Such a trust is jeopardized by a sexual relationship; it is entirely underminded where a client is an emotionally vulnerable individual seeking counsel with respect to divorce.

> . . .

> [Mr. Burton's client] suffered under extreme stress and was highly medicated when she sought ... legal services for her [divorce]. Her condition was obvious. She had a right to expect her attorney to conduct himself in accord with the highest standards of the profession; he failed. Although [the client] was a willing party . . . and therefore deserving some responsibility, her attorney must be held to a far higher standard. He exploited the professional relationship to satisfy his sexual interest. Such self-centered, callous and reckless behavior is a gross abuse of the privilege of practicing law. The danger of such impropriety became manifest in the "chilled" attorney-client relationship and redefined financial arrangements that followed their sexual relationship.

(Id.)

Mr. Burton's papers before this Court attempt to minimize the significance of his

conduct. In his affidavit submitted in reply to Defendants' opposition, he explains that his client

"came to [his] hotel room at 2 00 am with a bottle of champagne." (Pls.' Reply, Burton Aff. ¶

14.)  He states, "I admit to this one and only sexual encounter.  The divorce case was later settled favorably for [my client]."  Mr. Burton points out that this situation came to the attention of the Florida Bar by his own admission.  Specifically, he explains that "[o]ne and one-half years later, [my client] called me in an attempt to have me testify against an attorney she was blackmailing.  I refused to participate in this scheme and called the Florida Bar to report the incident, at which point I admitted the prior sexual encounter.  Thereafter [she] brought bar charges against me."  (Id. ¶ 15.)

The Court is puzzled by Mr. Burton's reaction to both of the 1990 disciplinary matters.  Little, if any, of his explanatory statements address concerns that might arise when the Court reviews his past conduct in consideration of his *pro hac vice* admission.  As to the first incident, it is irrelevant whether Mr. Burton was distraught by a confrontation with his opposing counsel or whether or not he knew that alcohol would exacerbate "'roid rage."  As to the second allegation, the Court is not interested in the outcome of his client's litigation or the number of sexual encounters Mr. Burton had with his client.   What is seemingly absent from Mr. Burton's papers, and what would have been of interest to this Court, is any indication of remorse or rehabilitation – or at the very least an acknowledgment that the type of behavior he previously exhibited is unacceptable.

### b. 1992 Admonishment and 1994 Public Reprimand

Neither of Mr. Burton's disciplinary actions in 1992 and 1994 are discussed in detail by Defendants, and Mr. Burton provides this Court with no explanation for them.  The Court will note, however, what it finds of relevance in the referee's report from the 1994 hearings.

The Report of Referee dated on or about September 6, 1994, references the 1992 action,

only providing that Mr. Burton "received an admonishment for minor misconduct." (Report of Referee of 9/6/1994.)  No further information on the events leading to that disciplinary action was made available to the Court. The 1994 complaint involved a deposition wherein Mr. Burton and his opposing counsel were rude and disruptive to each other's questioning.  The atmosphere between the attorney was described as "highly charged," and Mr. Burton told his adversary to "shut up" and "sit down."  Mr. Burton apologized and later expressed remorse at the hearing before the referee. (Id.)

The referee recommended that Mr. Burton be found guilty of various ethical rules, including failure to respect the legal system and failure to respect the rights of third persons.  The referee found Mr. Burton's previous disciplinary noteworthy and was part of the reason for the suggested reprimand.  (Id.)

### c. 1998 Suspension

On or about March 5, 1998, the Supreme Court of Florida suspended Mr. Burton from the practice of law for the second time for a term of sixty days.  Mr. Burton "submitted an Unconditional Guilty Plea and Consent Judgment for Discipline."  As a condition of his probation following the suspension, Mr. Burton agreed "to submit an evaluation by Florida Lawyers Assistance, Inc."  (Report of Referee of 2/18/1998.)

The bar complaint leading to this disciplinary action arose from sanctions against Mr. Burton entered by a trial court in Florida.  In that litigation, Mr. Burton represented former owners of a Miami Beach home who were sued by the current homeowner.  Following a mistrial, the plaintiff's lawyer in the case filed a motion for sanctions against Mr. Burton for his "injudicious remarks."  Those "remarks," made after the declaration of a mistrial, and when the

14

court was practically empty, included Mr. Burton's "singing or humming of 'Springtime for

Hitler.'"  The remarks were "perceived by the Plaintiff to be an insult to her and her ethnic

background," although Mr. Burton "contend[ed] that he did not intend to insult the Plaintiff."

(Id.)

The trial court had three other bases for its sanctions against Mr. Burton.  First, the court

found that Mr. Burton inappropriately engaged in a discussion with a witness subpoenaed by the

Plaintiff regarding whether or not the witness could leave.  Second, Mr. Burton brought more

witnesses to view property at issue in the case than were allowed by the Court.  Third, Mr.

Burton "rudely and inappropriately removed the tape paper from a Court Reporter's stenography

machine . . . at the above stated property viewing . . . believing the court reporter's attendance . . .

was not authorized."  (Id.)

Mr. Burton provided this Court with the following explanation regarding the remarks

made at the end of trial:

> I did in fact hum the tune "Springtime for Hitler" while packing up the boxes at the
> end of the day at trial in the presence of . . . (co-counsel), and the plaintiff and her
> counsel.  The plaintiff swore in the bar proceeding she was non-Jewish German.
> [Plaintiff] had no familiarity with the tune, rather her counsel advised her she had been
> insulted.  It was later uncovered that the plaintiff was not ethnic German, but rather
> Jewish Canadian of German heritage.  She was later indicted in the same case for an
> incident relating to forging a material document.

(Pls.' Reply, Burton Aff. ¶ 17.)

With regard to the other events, Mr. Burton "contend[ed] he was not responsible for

bringing the additional witness [to the property].  Instead, one authorized witness brought an

additional employee to the scene . . . [and he] was not aware of this additional expert was going

to attend until the individual appeared at the residence."  (Report of Referee of 2/18/1998; <u>see</u> <u>also</u> Pls.' Reply, Burton Aff. ¶ 18.)   The incident with the court reporter occurred after Mr. Burton "notified the court reporter he did not consent to a reporting of his confidential discussion with the expert witnesses." (Report of Referee of 2/18/1998).  When the reporter "persisted in reporting what [Mr. Burton] believed were confidential conferences ... [Mr. Burton] removed the paper tape from the stenograph machine," and delivered the paper to the Judge.  (<u>Id.</u>; <u>see</u> <u>also</u> Burton Aff.¶ 20.)  With respect to the conversation with a witness, Mr. Burton provides this Court with the following explanation:

> It was alleged that I inappropriately suggested that the opposing party's subpoenaed witness could leave before being released by opposing counsel.  The opposing counsel had subpoenaed a witness from out of town for the trial.  The witness had been sitting in the hallway for about three days.  The witness asked me if he could leave to feed his dog and I said that the witness should speak to (opposing counsel).  The Bar did not find that I released the witness, only that my discussion with the witness on the subject was inappropriate.

(Pls.' Reply, Burton Aff. ¶ 19.)

The referee's recommendation of guilt included violations of three Rules of Professional Conduct.  Specifically, rule 4-4.4, which states in pertinent part, "[i]n representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third party;" rule 4-8.4(a), which states "a lawyer shall not violate or attempt to violate the Rules;" and rule 4-8.4(d), which states that "a lawyer shall not engage in conduct in connection with the practice of law that is prejudicial to the administration of justice, including the knowingly, or through callous interference, disparage, humiliate or discriminated against litigants, jurors, witnesses, court personnel, or other lawyers on any basis."

Again missing from Mr. Burton's papers submitted to this Court in support of his initial

application and this appeal is any indication of remorse or assurance of rehabilitation.  Mr.

Burton does nothing to assuage this Court's obvious concern about admitting *pro hac vice* a

lawyer who has blatantly violated rules of professional responsibility and openly disrespected the

judicial system.  Again, in his explanations to this Court, Mr. Burton only points to the fault of

others, whether it be the court reporter's persistence, or that the plaintiff would not have

identified the "Springtime in Hitler" melody without the suggestion of her counsel.

### d. Pending Complaint

Following a trial in the Southern District of Florida, <u>Steve Harris v. Target Corp.</u>, case

No. 00-6107 (S.D. Fla.), attorneys from Shutts & Bowen LLP filed a bar complaint regarding Mr.

Burton's and his co-counsel's conduct during and after the trial.  After review of the complaint

and the responses from Mr. Burton and his co-counsel, the Florida Bar found probable cause as

to one of the alleged ethical violations against Mr. Burton.[3]  Specifically, the bar counsel found

probable cause that Mr. Burton had improperly contacted jurors in violation of Rule 4-3.5 of the

Florida Rules of Professional Conduct.  That Rule states in pertinent part:

> A lawyer shall not . . . after dismissal of the jury in a case with which the lawyer
> is connected, initiate communication with or cause another to initiate
> communication with any juror regarding the trial except to determine whether the
> verdict may be subject to legal challenge, provided, a lawyer may not interview
> jurors for this purpose unless the lawyer has reason to believe that grounds exist
> for such challenge may exist, and provided further, before conducting any such
> interview the lawyer must file in the cause a notice of intention to interview
> setting forth the name of the juror or jurors to be interviewed.  A copy of the
> notice must be delivered to the trial judge and opposing counsel a reasonable
> time before such interview.

Fla. R. Prof. Conduct 4-3.5.

---

[3]The other alleged violations detailed in the original complaint will not be discussed.

Mr. Burton represented a plaintiff in a lawsuit against Target Corporation alleging racial discrimination.  The case, tried in October 2001, resulted in a verdict for Target, but the trial judge granted plaintiff's motion for a new trial in February 2002.  In May 2002, a jury again entered a verdict for defendant Target.  After the second trial verdict, Mr. Burton and his co-counsel filed a Motion for Judgment as a Matter of Law seeking either a judgment in their favor or a new trial.  In support of this motion, they submitted an affidavit from a juror and an affidavit from Mr. Burton's co-counsel detailing an interview she conducted with another juror.  (Letter from Larry T. McMillan to the Fla. Bar of 11/04/2003.)  Defendant Target filed a motion to enjoin plaintiff's counsel from any further contact with jurors.  In response to the motion, Mr. Burton and his co-counsel admitted the communications with the jurors and in defense of their actions, they claimed that "Defendant's counsel was well aware of Plaintiff's contact with the jury AFTER the verdict and voiced no objection."   (Id.)

In his response to the bar complaint, Mr. Burton claimed that "he was not aware of the Court's rule that prohibits contact with discharged jurors."  (Letter from Herman J. Russomanno to the Fla. Bar of 2/18/2003 at 10.)  Mr. Burton "apologize[d] for this error," acknowledging that "as [a] trial attorney[,] [he] must know the rules."  (Id. at 7.)

The findings of Florida Bar's investigation into the complaint reveal that following the second trial against Target, Mr. Burton requested that his co-counsel approach jurors to "seek comments regarding his style, demeanor and performance."  (Letter from Larry T. McMillan to the Fla. Bar of 11/04/2003.)  After waiting for approximately 45-60 minutes outside of chambers, the jurors emerged and Mr. Burton's co-counsel "asked the departing jurors if any of them would speak to her." (Letter from Herman J. Russomanno to the Fla. Bar of 2/18/2003 at 8.)   Two

jurors agreed, and subsequent conversations ensued, which in turn, became the basis for the plaintiff's motion.  (<u>Id.</u> at 9.)

Mr. Burton's response to the bar complaint attempts to explain his conduct by asserting that, despite almost thirty years of trial experience, he was unaware of the rule prohibiting juror contact.  Further, he argues that even if he did violate the rule, "the rules of the Florida Bar regulating juror contact are designed to avoid embarrassment of the juror and any undue influence on that jurors' action in any subsequent jury service," and his co-counsel's contact was not with this intention.  (<u>Id.</u> at 9.)   Also, Mr. Burton suggests that the "rule has been in flux ever since its adoption by the Florida Supreme Court" somehow making it hard for him to know the true interpretation.  (<u>Id.</u>)

The Florida Bar's Investigating Member found probable cause for the bar complaint as to Mr. Burton, despite the fact that he did not conduct the juror interviews himself.  (Letter from Larry T. McMillan to the Fla. Bar of 11/04/2003.)  The probable cause was based upon Mr. Burton's specific instructions to his inexperienced co-counsel (she was admitted in 1999) to conduct the juror interviews and a finding that Mr. Burton should know the rules after almost thirty years of experience.  Although the Florida Supreme Court has not issued a formal ruling on this disciplinary complaint, this Court need not wait for that determination in order evaluate his conduct.

It appears to this Court that the rule prohibiting juror contact without leave of court is well-established in Florida and not in "flux" as Mr. Burton suggests.  Mr. Burton's conduct was a violation of not one, not two, but <u>three</u> Florida court rules.  This Court finds it hard to believe that after almost thirty years of trial practice, an experienced trial attorney was simply "unaware"

of Rule 4-3.5 of the Florida Rules of Professional Conduct, Rule 1.431(h) of the Florida Rules of

Civil Procedure, and Rule 11.1(E) of the Florida Federal Practice Rules – none of which are the

least bit unclear about how an attorney may contact jurors following a trial.

In his response to the bar complaint, Mr. Burton cites a 1974 Florida Court of Appeals

case to support his argument that "[i]t used to be common practice for counsel to interview jurors

at the end of a trial, both to find out 'what went wrong' and for the general education of

counsel.'" Brassell v. Brethauer, 305 So. 2d 217, 219 (Fla. App. 1974).  However, that same

case explains that despite the previous trend, "in 1966, upon petition of the Florida Bar of the

Supreme Court of Florida amended Canon 23 . . . so as to terminate indiscriminate interviewing

of jurors by requiring that a lawyer have 'reason to believe'[grounds for a verdict challenge exist]

and that he file notice of his intention to interview."  Id.  Interestingly, Mr. Burton also points to

the Florida Supreme Court's approved discharge instruction to suggest that Florida promotes the

"common practice" of communication with jurors after trial.  That instruction states, in pertinent

part: "The lawyers and their representatives are not permitted to initiate any communication with

you about the trial.  However, you may speak to the lawyers or anyone else about the trial."

(Letter from Herman J. Russomanno to the Fla. Bar of 2/18/2003 at 9) (emphasis added); see also

Fla. Forms of Jury Instr. § 2.43.

This Court fails to see how Mr. Burton's arguments support a finding that he was not in

violation of the juror communication rule.  Florida's ban on "indiscriminate" juror interviewing

was introduced as early as 1966.  Mr. Burton was admitted to the Florida Bar in 1974, and has

been an active trial lawyer since that time.  Mr. Burton's improper juror contact occurred in

2002.  Therefore, even if he failed to familiarize himself with his home state's basic civil

procedure and professional responsibility rules during his thirty years of practice, his significant jury experience would have provided him the opportunity to hear the jury discharge instruction on numerous occasions.  The repeated reminder that "the lawyers and their representatives are not permitted to initiate any communication with you," should have at the very least tipped him off to the limits on juror contact.

This Court is convinced that Mr. Burton's disregard for a rule clearly articulated in three basic rule books warrants serious concern.  For an attorney who has practiced law for over thirty years, and who has faced discipline on four different occasions, it is unfathomable to this Court that Mr. Burton has not undertaken a close review of his local court rules.  Mr. Burton's violation of a well-established Florida court rule indicates that his past disruptive conduct is not water under the bridge and he is not making steps toward reformation.  His papers before this Court fail to suggest as much, and his most recent conduct is further evidence to this Court that his continued improprieties are not isolated incidents.

The District of New Jersey is no different than other jurisdictions in that it requires and expects its attorneys, including those admitted *pro hac vice*, to follow the local practice rules, the federal rules and the state's professional conduct rules.  This Court has no tolerance for an attorney who blatantly violates a well-established rule and little tolerance for an attorney who does not familiarize himself with important court rules, especially an attorney who has been disciplined by his state bar on four different occasions.

### ii. Trial Conduct

As if the above listed incidents were not enough for this Court to have grave concerns about Mr. Burton's admission in this District, Defendants set forth examples of conduct in the course of other litigation which are equally troubling.  Defendants' submission includes reference to incidents during a trial in Broward County, Florida.  Although the judge's basis for a mistrial in the Broward County case included Mr. Burton's closing arguments, the case appears to have had "various and sundry problems," the substance and effects of which are disputed by the parties.  (Adkins v. Southeast Toyota Dist., Inc., case no. 94-2422, tr. page 2063.)  Although a motion for sanctions was filed by the defendants in that case, it was later withdrawn with prejudice.  Having reviewed the submission by Defendants and Plaintiffs with regards to this litigation, the Court finds it unnecessary to consider the alleged conduct arising from that litigation in the instant appeal.  However, the Court will explore recent conduct occurring in a matter before the United States District Court for the Eastern District of New York.

Mr. Burton represented plaintiff Adkins, a former GM dealer-operator, in a lawsuit against GM and GMAC in 2003 and 2004.  Adkins v. General Motors Corp., et al., 03-cv-3613 (E.D.N.Y.).  Defendants' counsel in the instant Dalton litigation represented GM in that matter.  Although aware of Mr. Burton's disciplinary history early in the case, they did not contest his *pro hac vice* application.  However, Defendants now contend that their experience with Mr. Dalton during the New York litigation motivated their opposition to Mr. Burton's *pro hac vice* application in this present matter.

Following several depositions in Adkins, defendants contacted the assigned magistrate judge regarding what they viewed as improper and unprofessional conduct by Mr. Burton during

discovery.  The court held a hearing on March 30, 2004, to hear from the parties following

various letter submissions to the court.  (Adkins Hearing Tr. of 3/30/2004.)  At the outset of the

hearing, defendants presented Mr. Burton's disciplinary record to the court.  (Id. at 7-8, and 24,

lines 1-14.)  The court called attention to the late notice of this history and told defendants'

counsel that the issue should have been brought to the attention of the court at the time of Mr.

Burton's *pro hac vice* application.  (Id. at 24, lines 9-11.)

Following descriptions of the deposition conduct from an attorney of each side, the court

read portions of deposition transcripts that it found "consitute[d] a personal attack, [was] ad

hominem, [was] arrogant, and was unbecoming someone who states they are a professional." (Id.

at 73, lines 19-22.)  Examples of comments and exchanges during depositions that the court

found troublesome included:

> [MR. BURTON to opposing counsel] You remind me of the kind of person that's sitting
> there and directing traffic in the middle of a hurricane.
> (Id. at 72, lines 16-18.)
>
> [MR. BURTON to opposing counsel] You know what? Go back to kindergarten, please.
> [OPPOSING COUNSEL] Go back to kindergarten?
> [MR. BURTON] Yes. Let me finish asking my question.  When I'm asking a critical
> question, don't have the audacity to interrupt me.  You have been sitting up there and
> acting like a schoolmarm.  Please let me ask the questions.
> (Id. at 73, lines 1-5.)
>
> [OPPOSING COUNSEL to Mr. Burton] Take your seat and keep your voice down.  I
> won't have you intimidate the witness.
> [MR. BURTON] I am not intimidating this witness.  I couldn't intimidate a witness.  I
> thank you.  That's the greatest compliment that you can make.
> [OPPOSING COUNSEL] Why don't you stop with the colloquy.
> [MR. BURTON] Then shut up.
> (Id. at 74, lines 23-25 to 74, lines 1-6.)

The court found the above remarks "unprofessional" and "uncivil," (id. at 75, lines 24-25), and

ordered Mr. Burton to issue a written apology to counsel with a file copy sent to the court. The court also put Mr. Burton on notice that if his unprofessional conduct continued, the court would issue an order to show cause why his *pro hac vice* admission should not be revoked. (<u>Id.</u> at 76, lines 1-13.) In response to accusations by defendants that Mr. Burton threw documents at witnesses, the judge ordered that all future depositions would be videotaped with the videographer directed to "show the entire scene, and not just beam in on the witness." (<u>Id.</u> at 77, lines 4-5.) The court also suggested a procedure for marking and distributing documents at depositions to prevent future conflicts between the parties because it appeared from the deposition transcripts that the attorneys grabbed documents from each other and from witnesses during depositions. (<u>Id.</u> at 77, lines 13-21.) Finally, the judge warned Mr. Burton that if he continued to improperly accuse opposing counsel of Rule 11 violations, as he had done during witness Pauline Adkins' deposition, the court might to impose Rule 11 sanctions on him for improper claims. (P. Adkins Dep., page 101, line 4; <u>Adkins</u> Hearing Tr. of 3/30/2004, page 78, lines 1-9.) Plaintiffs' submissions to this Court "acknowledge[] that the matters cited by [the] Magistrate Judge [in <u>Adkins</u>] . . . were uncivil and [Mr. Burton] regrets them." (Pls.' Reply at 9.)

Mr. Burton's most recent conduct in the Eastern District of New York <u>Adkins</u> litigation is a real concern to this Court for it shows a continued cavalier attitude toward the court rules and the privilege of *pro hac vice* admission. The temporary nature of *pro hac vice* admission heightens a court's concerns about an attorney's prior conduct because the attorney has little or no incentive to build a strong reputation with the court or the local legal community. Indeed, inhibitions that may arise from long-term admission to a court do not exist for an attorney admitted only for one case. This concern is further heightened when an attorney practicing under

*pro hac vice* admission poses problems for the court, as Mr. Burton did in the Eastern District of New York.

This Court's serious reservation about Mr. Burton's ability to practice in this district without causing havoc for the court and for the litigants is not tempered by Mr. Burton's explanations.  His explanations of prior conduct and his responses to recent allegations do nothing to assure the Court that he appreciates the significance of his past actions.  Indeed, his cavalier attitude toward his past ethical indiscretions is highlighted by the explanation he gave to the Eastern District of New York Magistrate Judge in the <u>Adkins</u> litigation.  When questioned about his suspension from practice, he told the Judge that he willingly pled to the bar complaint in exchange for time off from practice:  "I insisted upon taking two months off in the summer when my child was 12 and driving around the country.  So I insisted upon the suspension."  (<u>Adkins</u> Hearing Tr. of 3/30/2004, page 43, lines 1-4.)  This response hardly constitutes the display of contrition and recognition that would persuade this Court that Mr. Burton's shenanigans are behind him.  It appears to this Court that Mr. Burton's past discipline has had no rehabilitative or deterrent effect, thus the Magistrate Judge in this matter had more than an adequate basis to substantiate her decision to deny Mr. Burton's *pro hac vice* admission.

**B. Legal Conclusions - "Contrary to Law" Standard**

**i. "New Requirement"**

The decision by the magistrate judge was a discretionary one.  <u>See</u> N.J. Fed. Prac. R. 101.1(c).  With such a standard in place, and the admittedly scant case law, it should come as no surprise that the parties present differing interpretations of what they view as the requirements for

*pro hac vice* admission.  However, this Court is nonetheless surprised that Plaintiffs continue to assert that the <u>only</u> requirement for *pro hac vice* admission to this Court is to be a bar member in good standing, not under suspension or disbarment.  Despite quoting the rule and its discretionary language in their appeal papers, Plaintiffs argue that "[n]othing in the Local Rule suggests any requirement that an attorney seeking *pro hac vice* make any disclosure or representation beyond the fact that he or she is a member in good standing" (Pls.' Appeal at 4.) Further, Plaintiffs assert that Magistrate Judge Bongiovanni's Order was clearly erroneous because it "implicitly adds a new requirement in Local Civil Rule 101.1(c)(1)."  (<u>Id.</u> at 3.)

Plaintiffs are correct that the rule does not <u>require</u> anything more, however, this Court disagrees with the assertion that the rule does not <u>suggest</u> anything more.  The discretionary language indeed does suggest that the court may consider more than just the attorney's good standing, and as such invites applications to include or opposition to cite conduct which may be of interest to the Court.  Judge Bongiovanni did not deny Mr. Burton's application because he failed to disclose his disciplinary history.  She may have "criticized" (as Plaintiffs suggest) his failure to disclose the disciplinary history he knew would be brought to the Court's attention by Defendants.  However, she did not "implicitly add a new requirement" to the rule and nothing about her order indicates as much.

### ii. "Unclear" decision

Plaintiffs next argue that the Magistrate Judge's ruling was erroneous because she did not state whether she accepted any assertions made by Defendants and that her conclusion that Mr. Burton's "collective ethical history" warrants denial was unclear.  This Court, having reviewed the record, finds nothing unclear about what Judge Bongiovanni meant by Mr. Burton's

26

collective ethical history.  Mr. Burton has been disciplined four times by the Florida Bar.  His

prior discipline, the first incident which arose 14 years after he was admitted to the Bar, includes

harassment of opposing parties, improper deposition conduct, sexual relations with a client, and

improper management of client funds.  He currently faces a bar complaint for an admitted

violation of a rule available in three separate rule books.  A United States District Court in the

Eastern District of New York ordered Mr. Burton to issue an apology to opposing counsel

following improper conduct during discovery.  That same court ordered any depositions

involving Mr. Burton be videotaped.  This Court fails to see how the "history" referred to by the

Magistrate Judge could be unclear.  This Court finds "collective ethical history" is an accurate,

albeit abbreviated, description of the reasons for denying Mr. Burton's application.

### iii. Notice and Opportunity to Respond

Plaintiffs next argument focuses on the procedural requirements set forth by the Third

Circuit in Johnson, as discussed above.  Plaintiffs accurately state that the Third Circuit's

decision in Johnson provides that "some type of notice and an opportunity to respond are

necessary when a district court seeks to revoke an attorney's pro hac vice status."  629 F.2d at

303.  The Court first notes that Mr. Burton's application for *pro hac vice* admission was denied,

and denied in the early stages of litigation.  This situation is distinguishable from the revocation

in Johnson where the revocation came following trial.  Further, motion practice essentially

provides the same procedural steps set forth in Johnson.

Mr. Burton was clearly on notice from the time he applied for *pro hac vice* status.  First

and foremost, Plaintiffs made a motion to the Court for consideration of his admission *pro hac*

*vice*, evidence that he knew his application would undergo review.  At that time, Plaintiffs'

moving papers indicated that Defendants did not consent to his application, evidence that they knew Mr. Burton's application would be contested.   Defendants filed opposition papers to the application, evidence that Mr. Burton was on notice of the items considered objectionable about his past history.

Plaintiffs argue that Mr. Burton was entitled to "notice of the standard that will be applied to his conduct."  Id. at 304.  As discussed above, there is no one formula for considering a *pro hac vice* application.  Indeed, as Judge Bassler of this District stated in an article addressing the "erosion of civility" in the legal profession, "Incivility may be akin to pornography in that while it may be hard for us to define, we all know it when we see it."  W.G. Bassler, Lost Cause or Last Chance for Civility, N.J. Law J., July 10, 1995, at 23.  Defendants' papers articulated, in detail, the various concerns and issues of Mr. Burton's history that they thought the Court should take under advisement.  Mr. Burton was on notice as to which items might be considered in connection with his admission to this Court.  Indeed, in the proceedings in the Eastern District of New York, Mr. Burton admitted that he should have disclosed his prior history: "I do apologize for something that I should have delineated in greater detail."  (Adkins Hearing Tr. of 3/30/2004, page 43, lines 22-24.)

Next, Mr. Burton had "an opportunity to respond."  Following Defendants' opposition, the Court granted Plaintiffs additional time to submit reply papers.  As previously mentioned, those reply papers included 260 pages of supporting exhibits.   Plaintiffs assert that Mr. Burton should have been afforded an opportunity to testify and that he was entitled to a hearing. However, the Johnson decision clearly states that "a full scale hearing is not required in every case.  All that we mandate is that the attorney be given a meaningful opportunity to respond to

the identified charges." 629 F.2d at 304.  The decision to hold a hearing is within the discretion of the court.  Id.  Mr. Burton had ample opportunity to respond.

"Where a magistrate judge is authorized to use his or her discretion, the decision will only be reversed for an abuse of that discretion." Cooper Hosp., 183 F.R.D. at 127.  This Court sees no evidence that Judge Bongiovanni abused her discretion in this regard.  The Court had over 260 pages of material from Mr. Burton and he was given extra time to submit that information.  This Court decides many motions "on the papers."  Indeed, issues and entire cases are decided, at times, without the parties ever stepping foot into Court.  Mr. Burton's *pro hac vice* admission does not require an evidentiary hearing.

The above referenced disciplinary history and quoted deposition exchanges have not been challenged by Mr. Burton as inaccurate.  Therefore, this Court finds that with a full record before her, Judge Bongiovanni had all that she needed to make a well informed decision in this matter.

### iv. Deference

Plaintiffs next argue that Judge Bongiovanni's order is "contrary to law and clearly erroneous because it provides no deference or weight to the interests of the client to counsel of his or her choice and the professional reputation of the attorney involved."  (Pls.' Appeal at 8.) Plaintiffs assert that because Judge Bongiovanni's order did not reference consideration of this factor, her order is contrary to law.  However, Plaintiffs cite no authority for this proposition or for the proposition that a Plaintiff's choice of attorney outweighs the Court's own interest in overseeing the high standards of attorney conduct in its courtrooms.

In reviewing application for *pro hac vice* admission, this Court must look out for the best interest of the litigants and attorneys that appear in this Court.  Indeed, this includes the very

29

Plaintiffs in this matter who submitted Mr. Burton's application.  As the gatekeeper to out-of-state attorneys, the Court can and should consider an attorney's past conduct to determine if troubling events in the attorney's history create reasons to deny *pro hac vice* admission.  As a result, a party may find itself unable to have the out-of-state attorney as their counsel in the matter before the Court.  The local rule clearly states that the admission is discretionary and should Mr. Burton wish to have automatic admission, he is not prevented from undertaking the necessary steps to become a member of the New Jersey bar.

This Court will not decide whether or not Judge Bongiovanni paid due consideration to the interests of plaintiff having the counsel of his choice, as Plaintiffs have failed to convince this Court that such an articulation in her order is required.  The Court recognizes that Mr. Burton provides valuable experience with the workings of Defendants' company, however, this advantage simply does not wipe his slate clean.   He is subject to the same scrutiny that this Court applies to every lawyer seeking admission to this Court.

This case is in the early stages of litigation, having just been filed in February, and Plaintiff currently has at least eight attorneys of record.  Although dispositive motions are pending, the action is currently stayed pending the outcome of this very appeal, indicating that this Court has indeed considered the parties' interests in this matter.

### v. Lesser Sanctions

Finally, Plaintiffs argue that the magistrate judge's order is contrary to law and clearly erroneous because there were lesser sanctions or measures she could have invoked.  Nothing in the case law or the rules requires this Court to take a "wait and see" approach.   The Court realizes that in the <u>Adkins</u> litigation, videotaped depositions were used to curb future disruptive

conduct.  This Court is not a babysitter.  The Court sees no reason why litigation should begin with the Court bearing the additional responsibility of assuming such a role in connection with discovery  – or why the parties should bear additional costs because their attorneys cannot be trusted.

Plaintiffs point to Mruz v. Caring, Inc., 166 F. Supp. 2d 61 (D.N.J. 2001), in support of their argument that alternative "sanctions or measures" are available.  However, in Mruz, the district court reversed a magistrate judge's decision to revoke an already issued *pro hac vice* application in a case that was in its third year of litigation.  Id. at 70-71.  In that case, the magistrate judge sought to impose sanctions on the out-of-state attorney and chose revocation of the attorney's *pro hac vice* status.  In the instant case, the Magistrate Judge did not seek to impose sanctions on Mr. Burton.  Mr. Burton asked to be admitted, and his motion was denied. This Court refuses to ignore a pattern of unacceptable attorney conduct that requires necessary attention and appropriate action.

### C. "Collective Ethical History"

As stated in this District before:

> This court is growing increasingly distressed by the deteriorating level of civility and decorum that has long been the hallmark of this estimable profession.  It is the obligation of this court to protect and nurture the vestiges of professional legal conduct so that the practice of law is once again not only socially and commercially valuable, but also enjoyable and worthy of esteem.  This court takes this obligation seriously, and conduct before the court that violates the principles of courtesy and professionalizm embodied in the Rules of Professional Conduct will not be tolerated.

Mruz, 166 F. Supp 2d at 71.   Although granted liberally, admission *pro hac vice* is a privilege,

not a right, and is granted at the discretion of the Court.  Mr. Burton appeals the magistrate judge's conclusion that his "collective ethical history" prevents his application to practice in this Court.  This history includes two suspensions, one reprimand, one admonishment, a pending bar complaint, and litigation conduct in a recent case before the Eastern District of New York that required court intervention.

Mr. Burton not only fails to take responsibility for his past conduct, but he also fails to provide assurance to this Court that he understands his conduct must change.  Mr. Burton's continued improper conduct toward witnesses, litigants and opposing counsel is evidence to this Court that Mr. Burton does not meet the standards required for admission to this District.  His lack of courtesy and decorum, repeated and documented over his long professional history, convince this Court that the Magistrate Judge made a well-reasoned decision when she denied Mr. Burton's *pro hac vice* application.

This Court finds nothing clearly erroneous or contrary to law about Magistrate Judge Bongiovanni's June 24, 2005 Order.  Her decision is well-supported by the facts and the law.  Therefore, this Court affirms the June 24, 2005 Order and the decision to deny Mr. Burton's *pro hac vice* application.

**IV. Conclusion**

Having considered the papers submitted by the parties, the Court affirms Judge

Bongiovanni's June 24, 2005 Order.   An appropriate form of order will be filed herewith.


Date:   August 16, 2005

                                        _____s/Stanley R. Chesler_____
                                        Stanley R. Chesler, U.S.D.J.