**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____

| | | |
|---|---|---|
| | x | |
| JAMES R. DALTON, et. al, | x | |
| | x | Hon. Stanley R. Chesler, U.S.D.J. |
| Plaintiffs, | x | |
| | x | Civ. No. 05-727 |
| v. | x | |
| | x | **OPINION** |
| | x | |
| GENERAL MOTORS CORP., et. al, | x | |
| | x | |
| Defendants. | x | |
| | x | |

_____

## CHESLER, District Judge

      This matter comes before the Court on a motion by the defendants, General Motors Corporation, and defendants Madaras, Romero, Doss, Chrzanowski, Powell, Wesley, and Gerosa (hereinafter "Defendants") for partial summary judgment against plaintiff Richard R. Dalton. [Docket Entry No. 5.]  Defendants argue Mr. Dalton's claims against them are barred by a release agreement he signed in February of 2002.

      By letter dated September 23, 2005, after the instant motion had been fully briefed and argued, plaintiffs' counsel requested leave (1) to withdraw the Affidavit of James R. Dalton submitted in connection with this motion; (2) to withdraw Mr. Dalton as proposed class representative without prejudice to any of his claims as a member of the putative class or otherwise; or, alternatively, (3) to file a motion to withdraw as counsel for Mr. Dalton.  [Docket Entry No. 52.]  As explained below, summary judgment is proper against Mr. Dalton whether or not Mr. Dalton's affidavit is considered.  The Court, therefore, allows Mr. Dalton to withdraw his

affidavit[1] but discusses below why summary judgment would be proper even if he did not. The withdrawal of Mr. Dalton's affidavit leaves no record evidence in opposition to the Defendants' motion and, therefore, the Court **GRANTS** summary judgment in favor of the Defendants and against Mr. Dalton. Moreover, the Court will allow the plaintiffs to withdraw Mr. Dalton as proposed class representative and allow Mr. Dalton to withdraw, without prejudice, his claims that are not subject to the Release Agreement on the condition that he remains amenable to discovery in this case as if he were a party. During a teleconference with the Court on October 12, 2005, plaintiffs' counsel sought to be relieved as counsel to Mr. Dalton the extent they might be obligated to continue to represent him in connection with ongoing discovery. The Court granted plaintiffs' counsel's request subject to certain conditions outlined in the Order issued on the date hereof. The Court now turns to its analysis of Defendants' motion for summary judgment, had Mr. Dalton's affidavit not been withdrawn.

## I.   FACTS

This case arises from commercial arrangements between a putative class of automobile dealers who entered into dealership agreements with defendant General Motors ("GM"). Mr. Dalton is a proposed representative of the putative class. The instant motion is limited to Mr. Dalton's claims.

It appears from the record that GM approached Mr. Dalton in 1996 about entering into an agreement to form Trenton Chevrolet, Inc., d/b/a Princeton Chevrolet (the "Dealer Company"), to acquire the assets of Cahill Chevrolet, Inc. and operate a GM dealership at facilities located at

---

[1]Allowing Mr. Dalton to withdraw his affidavit does not erase its existence. Indeed, nothing in this opinion shall be construed to prohibit use of his affidavit in future proceedings.

2

1100 Spruce Street, Lawrenceville.  (Affidavit of Richard R. Dalton ("Dalton Aff") at para. 2; Complaint at para. 160-161.)  GM represented that the new dealership had a potential earnings of $300,000 per year, a new dealership location would be forthcoming within a year of Cahill Chevrolet's closing, and construction of the new dealership would be finished within two to three years.  (Dalton Aff. at para. 2.)  Mr. Dalton stated he was not provided with financial data, GM assessments or studies, or environmental studies for Cahill Chevrolet before closing on the dealership.  (Id. at para. 2.)  To consummate the dealership agreement, Mr. Dalton signed a Buy-Sell Agreement, Shareholder's Agreement, Corporate By-laws, and Certificate of Incorporation, which Mr. Dalton stated were prepared by GM and not negotiable or negotiated in any way by Mr. Dalton.  (Id. at para. 4.)

According to the Dealer Company formation documents, GM invested a $750,000 in exchange for 7,500 shares of preferred stock, and donated an additional $500,000 in capital to the Dealer Company.  (Mozingo Aff., para. 5 & Exh. A at I.1.2.)  Mr. Dalton invested $200,000 in the dealership in exchange for 21% of the common stock, (Dalton Aff. at para. 5), and granted GM the right to buy his stock at book value if the Dealer Company suffered losses exceeding $190,000, (Mozingo Aff., Exh. A, para. III.3.1(e)).

Mr. Dalton claims that GM made misrepresentations to induce him to buy into the Dealer Company.  First, Mr. Dalton claims that GM failed to advise him that Edward Cahill, the dealer principle of Cahill Chevrolet and owner of the property on which the Dealer Company operated, suffered a loss of a half million dollars per year.  (Dalton Aff. at para. 6.)  Second, Mr. Dalton claims he discovered that Mr. Cahill had filed for bankruptcy two days before he closed on the Dealer Company.  (Id.)  Third, Mr. Dalton claims he discovered that, before Mr. Dalton closed

3

on the Dealer Company, Mr. Cahill sold many of the predecessor dealership's vehicles without remitting proceeds to GM, and filed a lawsuit against GM that settled for undisclosed terms.  (Id. at para. 7.)  Fourth, Mr. Dalton claims he discovered environmental problems with the property on which the Dealer Company operated.  (Id. at para. 8.)  Although Mr. Dalton advised the board of directors of the Dealer Company that the new entity did not cause the contamination, GM-appointed board members required Mr. Dalton to pay for remediation.  (Id. at para. 9.)  Mr. Dalton stated that GM representatives told him GM would advance the clean up cost, but then GM treated the advance as a capital advance, which he claims "water[ed] down" his interest and increased the buyout price of GM's preferred stock.  (Id.)

Mr. Dalton withheld rent from Mr. Cahill to offset the costs of the environmental cleanup.  (Id. at para. 10.)  Mr. Cahill sued the dealership to recover the rent and GM, through its agents on the board of directors of Trenton Chevrolet, Inc., settled for undisclosed terms.  (Id.)  The Dealer Company never received proceeds from the settlement and continued to bear the cost of the cleanup.  (Id.)  Mr. Dalton stated that after the settlement, GM told him to pay for the clean-up initially and that it would repay the Dealer Company.  (Id. at para. 11.)  He stated "I was then ordered to expense the clean-up costs as a capital expenditure," which he claims had the effect of decreasing his percentage of ownership in the Dealer Company, and thus his percentage of the profits.  (Id.)

Mr. Dalton also claims that GM engaged in misconduct after he closed on the Dealer Company.  Mr. Dalton stated that Defendants had not begun the search for a proposed site for the new dealership until 1998, the search took two and a half years to complete, and they failed to complete construction for another two and a half years, "through inattention and incompetence."

4

(Id. at para. 12-13.)  Mr. Dalton claims that GM demanded that the Dealer Company pay for expenses associated with the delays, which he argues were attributable to GM's incompetent design and construction.  (Id. at para. 14.)  Plaintiff further claims that GM demanded that such expenses be accounted for as a capital expense, further watering down his profits, devaluing his stock, and prohibiting him from retiring preferred stock.  (Id.)  Further, Mr. Dalton claims the delay caused him to incur the further expense of carrying inventory he ordered in reliance on GM's projected opening of the new facility.  (Id. at para. 17.)  Moreover, Mr. Dalton claims GM's delay in finishing the new property, coupled with a notice of eviction by Mr. Cahill, forced him to move into the new facility in February 2001, a year before its completion.  (Id. at para. 18.)

As a result of these problems, which Mr. Dalton claims GM either caused or was aware of before closing, the Dealer Company operated at a loss.  (Id. at para. 15.)  Indeed, by June, 2001, the Dealer Company had suffered losses in excess of $3.2 million.  (Mozingo Aff. at para. 7.)  In light of the Dealer Company's economic problems, Mr. Dalton stated that GM made contributions that "started as a 'donation' [and] became a loan" to the Dealer Company, (Dalton Aff. at para. 15; Mozingo Aff. at para. 7), which he claims further watered down the value of his stock, (Dalton Aff. at para. 16).

Mr. Dalton claims that, from September 2001 to February 2002, GM engaged in a "campaign to induce [him] to sign various documents" in connection with the new property.  (Id. at para. 19.)  Mr. Dalton discussed these documents with GM representatives, including Jeffrey Rochwanger and Gerard Calone.  (Id.)  Mr. Dalton questioned GM about the documents, and the parties discussed the prospect of him suing GM if he did not sign the documents.  (Id.)  Messrs.

5

Rochwanger and Calone advised Mr. Dalton that if he did not sign them, he would be terminated. (Id. at para. 20.)  Mr. Dalton stated the choice between walking away from the six years and $200,000 he had invested in the dealership or signing GM's documents placed him under tremendous pressure.  (Id.)  Mr. Dalton stated that he "was not permitted to obtain the advice of an attorney concerning the documents, and of course the terms and provisions of the documents were non-negotiable."  (Id.)  He claims he did not sign the reorganization documents voluntarily, but was "coerced and intimidated into signing them" and that he did not receive anything in exchange for signing them.  (Id.)  Ultimately, Mr. Dalton signed the reorganization documents on February 1, 2002.

Among the documents was the February 1, 2002 Action by Board of Directors & Stockholders for Plan of Reorganization by Written Consent (the "Plan").  Pursuant to the Plan, defendant GM (1) forgave the Dealer Company six demand notes totaling $1,186,500 and converted that amount to donated capital; (2) made an additional donation to capital in the amount of $1,902,828; and (3) agreed that a previous subscription to the Dealer Company's capital in the amount of $551,800 would be converted to 2,268 shares of preferred stock for the price of $226,800 and that the remaining $325,000 would be converted into additional donated capital.  (Mozingo Aff., Exh. D.)

Also among the reorganization documents was the General Release and Arbitration Agreement (the "Release Agreement"), which forms that basis for Defendants' motion.  The Release Agreement recites GM's financial obligations under the reorganization.[2]  (Id., Exh. G,

---

[2]Specifically, the Release Agreement states that the parties have agreed to "reorganize" the dealership and recites GM's obligations to make a donation of capital to the company in the amount of $1,186,500 in exchange for demand notes, provide additional capital of $119,681, and

para. 1.)  The Release Agreement further contains a paragraph entitled "Release of Claims,"

which provides in relevant part as follows:

> In consideration of the promises contained in this Agreement, Dalton, on behalf of himself, his heirs, assigns, successors, agents and other legal representatives (hereinafter collectively referred to as the "Releasors"), does hereby release and forever discharge GM, the Dealer Company, and their predecessors, subsidiaries, officers, directors, employees, agents, representatives, successors and assigns (hereinafter collectively referred to as the "Released Parties"), from any and all actions, causes of actions, debts, expenses, claims, and demands of every kind, name and nature, both at law and in equity, which the Releasors now have, may have or ever had, arising from any events prior to the date of this Agreement, including, without limitations, any claims arising out of or in any way related to the obligations created by the Stockholders Agreements, the business relationship between GM and Dalton, any investment by Dalton in the Dealer Company, the sale of any land owned or occupied by the Dealer Company, any other matters related to the Dealer Company, Dalton's investment in the Dealer Company, or for personal injuries.  **EXCEPT AS OTHERWISE SPECIFICALLY PROVIDED FOR HEREIN, THE RELEASE IN THIS PARAGRAPH IS A GENERAL RELEASE AND THE SETTLING PARTIES INTEND AND AGREE THAT IT SHALL BE INTERPRETED, CONSTRUED AND ENFORCED AS SUCH.**

(Id., Exh. G, para. 2(a).)  Mr. Dalton further agreed not to sue GM or assist in any lawsuit against

it that is covered by the release.  (Id., Exh. G, para. 2(b).)  Mr. Dalton signed the Release

Agreement on behalf of himself individually and as president of the Dealer Company.  (Id., Exh.

G.)

---

states that a previous donation to capital of $1,783,147 were all provided to reimburse the dealership for losses incurred for a period ending June 30, 2001.  (Affidavit of Michael Mozingo ("Mozingo Aff."), Exh. G, para. 1.)  The Release Agreement further states that GM shall convert its Subscription to Capital in the amount of $551,800 to 2,268 shares of Preferred Stock in the Dealer Company for the sum of $226,800 and Additional Capital in the Dealership Company of $325,000.  (Id.)  In short, the reorganization obligated GM, within 14 days, to restructure certain debt, forgive certain debt, and infuse cash into the Dealer Company.

The record also reflects a document entitled "Agreement Regarding Documents and other Related Motors Holding Dealer Company Investment Issues" (hereinafter the "Investment Agreement"). (Id., Exh. H.) The Investment Agreement incorporates the Release Agreement by reference and states that Mr. Dalton (1) was advised by counsel in connection with the reorganization (id., Exh. H, para. 2(a)); (2) has such knowledge and experience in financial and business matters that he is capable of reading and interpreting the documents and evaluating the reorganization (id., Exh. H, para. 2(b)); (3) has been given access to documents and information related to the reorganization (id., Exh. H, para. 3(a)); (4) understands the risk that both he and GM could lose their entire investment in an unprofitable dealership (id., Exh. H, para. 3(b)); (5) understands that GM may have ownership interests in other dealerships, including those in the same market area as Mr. Dalton, or other business entities that may or may not do business with him (id., Exh. H, para. 3(c); (6) understands that GM may be engaged in the activity of buying and selling other GM dealerships, including those in the same market as Mr. Dalton's (id., Exh. H, para. 3(d)); and (7) understands that GM's shares in the dealership could only be retired through profits of the dealership (id., Exh. H, para. 3(e)).

After the reorganization, Princeton Chevrolet commenced business and was profitable in 2002. (Dalton Aff. at para. 21.) In 2003, however, a mechanic's union threatened to strike, which Mr. Dalton claims was perpetrated by GM. (Id.) Mr. Dalton stated that GM-appointed directors of Princeton Chevrolet assisted a competing GM dealership, Patterson Chevrolet, Inc. (on whose board they also served), in negotiating a union contract while advising Mr. Dalton not to let the union strike. (Id.) Mr. Dalton stated this led to a year-long union strike and substantial damages to Princeton Chevrolet. (Id. at para. 22.) Mr. Dalton further stated that the GM-

appointed directors encouraged the competing dealership to raid Princeton Chevrolet's customer

base and refused to allow Princeton to accept fewer vehicles from GM, forcing it to incur

financing costs from GMAC, a GM subsidiary.  (Id. at para. 23.)  At some point during 2003, Mr.

Dalton attended a meeting with Princeton Chevrolet's attorney, an Automotive Mechanic's

Union representative, and a federal mediator, at which it was discussed that Glenn West, the

dealer/operator of Patterson Chevrolet, another dealer in the region, was going to purchase

Princeton Chevrolet.  (Id. at para. 26.)  Mr. Dalton stated he found this curious, but did not give it

much thought.  (Id. at para. 26.)

In August, 2004, GM performed an audit, which indicated Princeton Chevrolet was

operating below capital requirements but Mr. Dalton stated he was assured the results "meant

nothing because the dealership was profitable."  (Id. at para. 24.)  On November 12, 2004, upon

completion of the audit, GM terminated Mr. Dalton as a dealer/operator of Princeton Chevrolet,

Inc.  (Id. at para. 25.)  Shortly thereafter, Patterson Chevrolet, Inc. purchased Princeton

Chevrolet.  (Id. at para. 26.)

## II.    PROCEDURAL HISTORY

Plaintiffs filed the Complaint in this matter on February 2, 2005.  [Docket Entry No. 1.]

On March 28, 2005, Defendants filed motions (1) to dismiss various of plaintiff's claims [Docket

Entry No. 3], (2) to strike plaintiff's class allegations [Docket Entry No. 4], and (3) for partial

summary judgment against plaintiff James R. Dalton [Docket Entry No. 5].  After oral argument

on the motions on September 20, 2005, the Court dismissed Counts II and V with prejudice;

9

dismissed Counts VI and VII without prejudice with the consent of plaintiffs[3]; dismissed Counts VIII and IX with prejudice with the consent of plaintiffs; denied defendant's motions to dismiss Count X and to strike plaintiffs' class allegations; and granted plaintiff Theldon R. Branch, III's application to withdraw his claims pursuant to Fed. R. Civ. P. 41 on the condition that he remains subject to discovery in this case as if he were a party.  [Docket Entry No. 51.]  The Court reserved ruling on defendants' motion for partial summary judgment on Mr. Dalton's claims based upon the Release Agreement, which is the subject of this opinion.

In support of their motion for partial summary judgment, Defendants argue Mr. Dalton's claims are barred under the Release Agreement.  Defendants argue the Release Agreement is clear and unambiguous and Dalton entered into it knowingly and received consideration.  (Def. Br. at 8.)  Namely, defendants argue that GM contributed over $3.4 million to the dealership, which enabled Mr. Dalton to continue its operation for another three years.  (Id. at 10.) Relatedly, Defendants argue that Mr. Dalton's failure to tender GM's contributed consideration prevents him from avoiding obligations under the Release Agreement.  (Id. at 11.)  Further, Defendants argue the documents themselves, which state that Mr. Dalton was represented by counsel and capable in business matters, show there was no surprise, fraud, or duress.  (Id. at 9-10.)  Defendants argue that by continuing to operate the dealership and retain the benefit of the consideration, Mr. Dalton ratified the agreements signed in February 2002.  (Id. at 10-11.)

While Mr. Dalton does not dispute the content of the reorganization documents, as discussed in detail below, he argues the Release Agreement is unenforceable due to lack of

---

[3]The Court noted that by dismissing these claims without prejudice, it did not grant leave to amend.  Rather, it stated that such leave, if any, would be the subject of a motion by the plaintiffs under Rule 15.

consideration, unconscionability, fraud, and duress.[4]

## III.   DISCUSSION

### A.   Summary Judgment Standard

Federal Rule of Civil Procedure 56 provides that summary judgment may be granted if the materials submitted to the Court show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56; Hersh v. Allen Prods. Co., 789 F.2d 230, 232 (3d Cir. 1986); Lang v. New York Life Ins. Co., 721 F.2d 118, 119 (3d Cir. 1983).  Where the facts are not in dispute and the issues contested in a summary judgment motion are legal issues, the Court may proceed to decide the legal issues and rule accordingly on the summary judgment motion.  See Ingram v. County of Bucks, 144 F.3d 265, 267 (3d Cir. 1998) (when there is no genuine issue of material fact in dispute and the issue facing the court is a question of law, it can properly be resolved on summary judgment).

### B.   Interpretation of the Release Agreement

Mr. Dalton concedes that the meaning of the documents Defendants submitted in connection with this motion are "self-evident."  (Plaintiff's R. 56.1 Statement at 2.)  The Court

---

[4]Mr. Dalton submitted a response to Defendants' Statement of Material facts, which states that, for the reasons set forth in his Affidavit and Brief, he "dispute[s], virtually in their entirety, the facts submitted by defendants as 'undisputed.'"  (Plaintiff's Statement of Facts in Accordance with Local Rule 56.1, ("Plaintiff's R. 56.1 Statement") at 2.)  Further, Mr. Dalton's submission states that the documents that Defendants submitted in support of their motion are "self-evident except that plaintiffs claim that those documents are illegal, unenforceable and void as unconscionable and for all of the other reasons stated in the pleadings and the aforementioned brief."  (Plaintiff's R. 56.1 Statement at 2.)  Moreover, Mr. Dalton contests the veracity of Mr. Mozingo's affidavit appending such documents based on his deposition transcript, which states that he lacked knowledge of many of the statements in the affidavit but does not specifically refer the Court to any such inconsistency.  (Id. at 3.)  Finally, the submission states "discovery on the very issues now before this Court remains to be conducted, including depositions of persons with actual knowledge."  (Id.)

agrees and concludes from the plain language of the Release Agreement that, assuming it is

otherwise enforceable, its effect is to release any and all claims by Mr. Dalton against GM or its

agents arising before February 1, 2002.  This Court must, therefore, construe and apply the

unambiguous terms of the Release Agreement "unless a contract provision violates law or one of

the traditional defenses to the enforceability of a contract applies."  Rory v. Continental Ins. Co.,

473 Mich. 457, 461, 703 N.W.2d 23, 26 (2005).

### C.    Enforceability of the Release Agreement

Mr. Dalton argues the Release Agreement is unenforceable because (1) he received no

consideration for it, (2) it is unconscionable, and it was procured through (3) duress and (4)

fraud.  For the reasons set forth below, had Mr. Dalton not withdrawn his affidavit, the Court

would reject his arguments and find the Release Agreement enforceable as a matter of law.

### i.    Consideration

Mr. Dalton argues the Release Agreement lacks consideration because (1) money that

GM contributed pursuant to the reorganization went to the Dealer Company, not to Mr. Dalton

individually (Pl. Br. at 5); (2) Mr. Dalton's stock value was not enhanced, contrary to the terms

of the documents (id. at 6-7); and (3) the reorganization documents were non-negotiable and,

therefore, there was no "bargained-for exchange" as required for valid consideration (id. at 7-8).

As a general matter, Michigan courts do not inquire into the adequacy of consideration

for a contract.  Cleveland-Cliffs Iron Co. v. Chicago & North Western Transp. Co., 581 F. Supp.

1144, 1150 (E.D. Mich. 1984); Moffit v. Sederlund, 145 Mich. App. 1, 12, 378 N.W.2d 491

(1985).  Consideration is "a benefit on one side, or a detriment suffered, or service done on the

other."  Gen. Motors Corp. v. Dept. of Treasury, 466 Mich. 231, 238-39, 644 N.W.2d 734 (2002)

(citations omitted).  Any consideration, however slight, is deemed by Michigan courts to be legally sufficient to support a promise.  Id. (citing Whitney v. Stearns, 16 Me. 394 (1839) for the proposition that "[a] cent or a peppercorn, in legal estimation, would constitute a valuable consideration."); Harris v. Chain Store Realty, 329 Mich. 136, 145, 45 N.W.2d 5 (1951).  To the extent courts have considered the adequacy of consideration, they have stated that a release from liability requires only nominal consideration.  Denton v. Utley, 350 Mich. 332, 344-45, 86 N.W.2d 537 (1951).  Courts find consideration to be lacking only when the record establishes that the consideration given was "so grossly inadequate as to shock the conscience."  Barden Detroit Casino, L.L.C. v. City of Detroit, 59 F. Supp. 2d 641, 669 (E.D. Mich. 1999); Cleveland-Cliffs Iron, 581 F. Supp. at 1150; Hake v. Youngs, 254 Mich. 545, 549, 236 N.W. 858 (1931).  Stated differently, inadequate consideration must embody "an inequality so strong, so gross and manifest that it must be impossible to state it to a man of common sense without producing an exclamation at the inequality of it."  Lenawee County Bd. of Health v. Messerly, 98 Mich. App. 478, 490-91, 295 N.W.2d 903, 908 (1980).

The reorganization, and the parties' respective consideration given, does not shock the conscience.  Consideration in the form of some $3.4 million from GM flowed to the dealership, an entity in which Mr. Dalton had an economic interest as shareholder and president.  This contribution assisted in the continued operation of the dealership, which held value to Mr. Dalton.  That Mr. Dalton benefitted from GM's contributions and forgiveness of debt to the Dealer Company is further evident from his personal release of claims against GM and its affiliates.  (Mozingo Aff., Exh. G, para. 2(a).)  Indeed, the detriment to GM, alone, is sufficient to support a contract.  See General Motors Corp., 466 Mich. at 238-39 (defining consideration as

"a benefit on one side, or a detriment suffered, or service done on the other."). Thus, GM's contributions to the Dealer Company are sufficient to satisfy the standards of adequate consideration under Michigan law.

Even assuming, however, that Mr. Dalton received no consideration personally, GM's contribution to the Dealer Company is sufficient to enforce the Release Agreement. The Restatement First of Contracts provides that "[c]onsideration may be given to the promisor or to some other person. It may be given by the promisee or by some other person." Restatement (First) of Contracts section § 75(2) (2005); see also Collins v. Parsons College, 60 A.L.R.3d 218, 203 N.W.2d 594, 599 (Iowa 1973). The author's comments under this section further states that "[i]t matters not from whom the consideration moves or to whom it goes. If it is bargained for as the exchange for the promise, the promise is not gratuitous." Restatement (First) of Contracts section 75 cmt. e. In this regard, the Restatement presents the following simple hypothetical: "A promises B to pay B $1, in exchange for C's promise to A to give A a book. The promises are consideration for one another." Id.; see also Alexander & Alexander, Inc. v. Wohlman, 19 Wash. App. 670, 684, 578 P.2d 530 (1978) (holding that delivery of stock to third party was sufficient to support non-compete agreement between plaintiff and defendant because "the delivery of [the] stock to [the third-party] constituted a detriment to [plaintiff] sufficient to provide consideration for the promises not to compete.").

As in the Restatement's hypothetical, GM promised to pay the dealership some $3.4 million in exchange for Mr. Dalton's promise to release his claims. Thus, "[t]he promises are consideration for one another." Restatement (First) of Contracts section § 75 cmt. e. Accordingly, had the Court reached this issue, it would have held that the Release Agreement

was supported by consideration and, therefore, must be enforced.

### ii.   Unconscionability

Mr. Dalton further argues the Release agreement is unconscionable because (1) the reorganization documents were presented on a take-it-or-leave-it basis, leaving him no meaningful choice but to sign (Pl. Br. at 10); (2) the terms of the reorganization documents are unreasonable (id.); and (3) the Release Agreement selects Michigan law, which requires a showing of illegality to prove duress (id. at 10-11).

The Michigan State Court of Appeals recently set forth the standard for determining whether or not unconscionability renders a contract unenforceable:

> In order for a contract or contract provision to be considered unconscionable, both procedural and substantive unconscionability must be present.  Northwest Acceptance Corp v. Almont Gravel, Inc, 162 Mich. App. 294, 302; 412 N.W.2d 719 (1987). Procedural unconscionability exists where the weaker party had no realistic alternative to acceptance of the term.  Allen v. Mich. Bell Tel Co, 18 Mich. App. 632, 637; 171 N.W.2d 689 (1969).  If, under a fair appraisal of the circumstances, the weaker party was free to accept or reject the term, there was no procedural unconscionability.  Id.  Substantive unconscionability exists where the challenged term is not substantively reasonable.  Id.  However, a contract or contract provision is not invariably substantively unconscionable simply because it is foolish for one party and very advantageous to the other.  Gillam v. Michigan Mortgage-Investment Corp, 224 Mich. 405, 409, 194 N.W. 981 (1923). Instead, a term is substantively unreasonable where the inequity of the term is so extreme as to shock the conscience.  Id.

Clark v. Daimlerchrysler Corp., -- N.W.2d --, 2005 WL 2217106 (Mich. Ct. App. Sep. 13, 2005). Thus, the Court must ask two questions: "(1) What is the relative bargaining power of the parties, their relative economic strength, the alternative sources of supply, in a word, what are their

options?; (2) Is the challenged term substantively reasonable?" <u>Husbacher & Son, Inc, v. Storey</u>, 228 Mich. App. 478, 481, 578 N.W.2d 701 (1998).

First, the record cannot support the conclusion that Mr. Dalton was without options. Instead of signing the Release Agreement, Mr. Dalton could have refused the reorganization and sued GM in February of 2001.  According to his affidavit, Mr. Dalton was aware of the factual bases upon which he now relies in support of his claims before he signed the release, namely the Cahill bankruptcy, the environmental issues, and the delays in procuring and constructing the new dealership.  Mr. Dalton chose not to pursue those claims but, rather, to release them in exchange for GM infusing additional capital into the failing dealership and forgiving certain obligations, which allowed him to continue operating the dealership.  While the Court will assume that GM's bargaining position is stronger, record evidence cannot support the conclusion that Mr. Dalton was without options.  Thus, had the Court reached this issue, it would have held that there could be no procedural unconscionability as a matter of law.

Second, the reorganization did not appear to be so one-sided as to "shock the conscience."  <u>See</u> <u>Gilliam</u>, 224 Mich. at 409.  Michigan courts consider whether a contractual provision is substantively unconscionable in view of the "commercial setting, purpose and effect of the provision."  <u>Reed v. Kaydon Eng'g Corp.</u>, 38 Mich. App. 353, 356, 196 N.W.2d 487 (1972).  In this case, the Release Agreement states the context in which the agreement was signed, namely that GM had previously contributed money to the dealership, and the dealership had suffered continuous losses, and had incurred expenses in connection with its relocation. (Mozingo Aff., Exh. G at 2-3.)  The reorganization had the effect, in part, of financing operations of the dealership.  As stated previously, Mr. Dalton benefitted from this in that he was able to

continue to run the dealership and, indeed, did so at a profit for the first part of 2002.  To the

extent Mr. Dalton argues that his stock was diluted as a result of the reorganization, the

reorganization documents, which he had ample time to review, disclosed the nature and extent of

any changes in shareholder status among the parties.[5]  Moreover, dilution of stock does not mean

that Mr. Dalton did not receive, and GM did not give, consideration in the form of capital to the

dealership, in which he has an economic interest.  Accordingly, had the Court reached the issue,

it would have held that a reasonable jury could not conclude that the Release Agreement was

unconscionable.

### iii.   Duress

Mr. Dalton argues the Release Agreement was procured through duress, namely that his

refusal to sign would mean his financial ruin.  (Pl. Br. at 11.)  Michigan contract law, however,

expressly states that fear of financial ruin or economic hardship, alone, is not a legally sufficient

basis for claiming duress.  See Transcon. Leasing, Inc. v. Michigan Nat'l Bank of Detroit, 738

F.2d 163, 166 (6th Cir. 1984).  Rather, a duress claim must be supported by evidence that serious

financial harm was threatened and that the person threatening acted unlawfully.  Apfelblat Nat'l

Bank Wyandotte-Taylor, 158 Mich. App. 258, 263-64, 404 N.W.2d 725 (1987).  Even in the face

of such threats, however, a contract will survive a claim of duress if it is entered into with full

knowledge of all the facts and with an opportunity for investigation, consideration, consultation,

---

[5]The dilution issue is debatable because, according to the reorganization documents, Mr. Dalton's percentage of common stock and voting rights remained the same.  Moreover, Mr. Dalton is hard pressed to argue that he was somehow misled where the documents themselves explicitly set forth the terms of the reorganization, which were not boilerplate in nature or the subject of buried footnotes.  In short, plaintiff's assertion that he was assured his ownership interest would not change is contradicted by the very documents that he reviewed for months and, ultimately, signed.

and reflection.  Payne v. Cavanaugh, 292 Mich. 305, 308, 290 N.W. 807 (1940).  The Court

notes some authority indicating that a party claiming duress need not show evidence of

"unlawful" conduct but rather that his "manifestation of assent is induced by an improper threat

by another party that leaves the victim no reasonable alternative."  Kelsey-Hayes Co. v. Galtaco

Redlaw Castings Corp., 749 F. Supp. 794, 797 (E.D. Mich. 1990) (noting the development of the

law of duress outside of Michigan and predicting "if the Michigan Supreme Court looked at the

issue today, it would rule that economic duress need not stem from an 'illegal' threat.").  This

Court need not predict whether or not the Michigan Supreme Court would retain the "unlawful"

requirement because the record evidence cannot support even a showing of "improper threats" by

GM to induce the reorganization.

          Mr. Dalton's reliance on the economic hardship he would face by walking away from the

six years and $200,000 he invested in the Dealer Company is insufficient to invalidate the

Release Agreement.  There is no evidence, and Mr. Dalton does not argue, that Defendants

illegality forced him to sign the reorganization documents.  Indeed, the reorganization came in

the wake of consistent losses by the Dealer Company, which Mr. Dalton claims were caused by

GM.  Mr. Dalton's affidavit demonstrates that he was aware of his purported claims against GM

for damages arising from fraudulent inducement, the environmental cleanup, and construction

delays at the time of the release.  Indeed, such claims were the subject of conversation between

Mr. Dalton and GM during the reorganization.  At paragraph 19 of his affidavit, Mr. Dalton

describes conversations with GM representatives in which he could either sign on to the

reorganization or assert his claims against GM.  Mr. Dalton accepted the terms of the re-

organization, proceeded to operate the dealership, and only attempted to revive his released

claims when the dealership lost money again in 2003 and GM exercised its rights under the reorganization documents to terminate him as a dealer operator.  For these further reasons, even if Mr. Dalton had not withdrawn his affidavit, plaintiff's duress claim would fail as a matter of law.

### iv.     Fraud

Mr. Dalton also argues the Release Agreement is unenforceable under the theory of fraud in the inducement.  He argues that GM representatives induced him to enter into the reorganization by misrepresenting the effect of the reorganization documents on his interest in the Dealer Company.  (Pl. Br. at 14-15.)  Mr. Dalton further argues the evidence of fraud is compounded by the non-negotiable and overreaching nature of the documents and that he was "precluded from obtaining the advice of counsel."  (Id. at 15.)

Michigan courts hold that "one who signs a contract cannot seek to invalidate it on the basis that he or she did not read it or thought that its terms were different, absent a showing of fraud or mutual mistake."  As the Michigan Court of Appeals stated in Moffit v. Sederlund, 145 Mich. App. 1, 8, 378 N.W.2d 491 (1985), "[f]ailure to read a contract document provides a ground for rescission only where the failure was not induced by carelessness alone, but instead was induced by some stratagem, trick, or artifice by the parties seeking to enforce the contract." Id.; see also Christensen v. Christensen, 126 Mich. App. 640, 645, 337 N.W.2d 611 (1983).  In determining the existence of fraud or mistake, a court will consider the haste, or lack thereof, with which the release was obtained, "the sum of money involved as consideration, and all the circumstances surrounding the release, including, of course, the conduct and intelligence of both

19

the releasor and the releasee." <u>Theisen v. Kroger Co.</u>, 107 Mich. App. 580, 583, 309 N.W.2d

676, 677 (1981) (citing <u>Denton v. Utley</u>, 350 Mich. 345, 86 N.W.2d 537 (1957)).

  Mr. Dalton did not sign the reorganization documents in haste.  Rather, he had several

months to consider the documents during GM's purported "campaign" to get him to sign them

from September 2001 to February 2002.  (<u>See</u> Dalton Aff. at para. 19.)  Indeed, the record

reflects that he scrutinized these documents closely enough to notice the slight differences

between versions.  (<u>Id.</u>)  Further, Mr. Dalton is an experienced automobile dealership owner

operator and the Agreement Regarding Documents and other Related Motors Holding Dealer

Company Investment Issues states that he has such knowledge and experience in business

matters that he is capable of reading and interpreting the reorganization documents.  (Mozingo

Aff., Exh. H, para. 2(b).)  Mr. Dalton further stated in his Rule 56.1 statement that this

agreement, and the other documents involved in the reorganization, were "self-evident."

(Plaintiff's R. 56.1 Statement at 2.)  The parties discussed the prospect of Mr. Dalton bringing a

lawsuit against GM for his complaints arising from their business dealings before February 2002,

but instead entered into the reorganization.  Pursuant to that arrangement, Mr. Dalton traded his

claims against GM for the financial concessions reflected in the Release Agreement.

  Finally, Mr. Dalton's assertion that he "was not permitted to obtain the advice of an

attorney concerning the documents" in connection with the reorganization (Dalton Aff. at para.

20) is inconsistent with the circumstances of the reorganization.  First, it strains credulity that

Dalton was precluded from consulting counsel during the approximately five months it took to

consummate the reorganization documents.  <u>Cf.</u> <u>Cochran v. Ernst & Young</u>, 748 F. Supp. 1548,

1557 (E.D. Mich. 1991) (rejecting duress argument and affirming validity of release where

plaintiff had three weeks to investigate agreement, reconsider agreement, and consult with

counsel before reducing it to writing).  Second, the face of the Investment Agreement, which Mr.

Dalton signed, states that he consulted counsel and that he was capable of understanding the

documents.  (Mozingo Aff., Exh. H, para. 2(a), 2(b).)  Third, even if Mr. Dalton's assertions are

taken as true, under Michigan law, inability to obtain advice of counsel is not fatal to a settlement

agreement.  See Stefanac v. Cranbrook Educ. Cmty., 435 Mich. 155, 193-95 & n.35, 458 N.W.2d

56 (1990) (stating at note 35 that the court does "not wish to be understood as saying that there is

anything wrong with a take-it-or-leave-it offer where the offeree is provided adequate time to

obtain counsel and evaluate his legal position.  A take-it-or-leave-it offer might be generous.");

Story v. Page, 280 Mich. 34, 40-41, 273 N.W. 384 (1937).  Fourth, at oral argument, plaintiff's

counsel withdrew Mr. Dalton's position that he was prevented from obtaining counsel and

instead argued that retaining counsel would have been futile because GM was unwilling to

negotiate the terms of the refinancing documents.[6]

In short, even if Mr. Dalton had not withdrawn his affidavit, the Court would hold that

the evidence of record simply could not support a finding that Mr. Dalton was fraudulently

induced to sign the Release Agreement.

---

[6]When asked how Mr. Dalton was prevented from obtaining counsel, Mr. Dalton's
attorney stated:

> Well, I suppose in the technical sense he might not have been
> prevented.  In other words, no one held a gun to his head and said
> you can't pick up the phone and call a lawyer.  Perhaps that word
> was not the most judicious word to use in the affidavit.  However,
> there would have been no point in obtaining a lawyer.

(T.26:6-12.)

21

**IV.    CONCLUSION**

For all of these reasons, the Court finds the Release Agreement enforceable as a matter of law and grants summary judgment in favor of Defendants and against Mr. Dalton.


s/Stanley R. Chesler
United States District Judge


October 14, 2005

22